UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

PHYLLIS J. SIGNORELLI,

    Plaintiff,

v.                 Case No.  5:05-cv-204-Oc-GRJ

JO ANNE B. BARNHART, Commissioner
of Social Security,

    Defendant.
_____/

## ORDER

    Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Social Security disability benefits. (Doc. 1.) The Commissioner has answered (Doc. 4) and both parties have filed briefs outlining their respective positions. (Docs. 10 & 11.) For the reasons discussed below, the Commissioner's decision is due to be **REVERSED and REMANDED**.

## I. PROCEDURAL HISTORY

    Plaintiff filed an application for SSDI benefits on July 26, 2002, alleging an onset date of June 29, 2001. (R. 36.)  Her claim was denied initially and upon review. (R. 32-33, 29-30.) On October 28, 2004, following a hearing, before Administrative Law Judge Albert D. Tutera (the "ALJ") he issued a decision unfavorable to Plaintiff. (R. 8-16.) Plaintiff's request for review of that decision was denied by the Appeals Council on February 17, 2005, rendering the ALJ's decision the final decision of the Commissioner. (R. 4-6.) On April 22, 2005, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, she is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.[11] Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled.[12] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[13]

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2003) (All further references to 20 C.F.R. will be to the 2003 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy

---

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987). *See also* Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.  In Doughty the court explained this burden shifting as follows:
> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996).  *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

4

that the claimant can perform.[19] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. SUMMARY OF THE RECORD

Plaintiff was born on November 22, 1940 and was 63 years old at the time of the hearing. (R. 153.) Plaintiff completed her education through high school. (R. 153.) Plaintiff worked in bank operations at Landmark Trust (which ultimately merged into Bank of America) from October 1974 through February 2000 until she was laid off. (R. 40-41.) Prior to leaving Bank of America, Plaintiff was involved in converting other bank systems to Bank of America software banking systems. (R. 157.)

After leaving Bank of America, Plaintiff complained that in June of 2001, her eyesight started bothering her and her vision began to blur. (R. 40.) On June 29, 2001, Plaintiff consulted with Dr. Mark Hammer, a board certified ophthalmologist, who performed a slit lamp examination on Plaintiff and ultimately diagnosed Plaintiff with diabetic macular edema,[21] and pre-proliferative diabetic retinopathy.[22] (R. 86-87.)

---

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

[21] Edema is an accumulation of an excessive amount of watery fluid in cells or intercellular tissues. Lippincott, Williams & Wilkins, Stedman's Medical Dictionary (27th ed. 2000).

[22] Diabetic retinopathy is retinal changes occurring in diabetes mellitus, marked by microaneurysms, exudates, and hemorrhages, and sometimes neovascularization. Stedman's.

Dr. Mark Hammer performed laser surgery on both of Plaintiff's eyes in July and August 2001 due to diabetic macular edema on the left and right sides. (R. 83-84.) Again, in October and November of 2001, Dr. Hammer performed laser surgery on both of Plaintiff's eyes. (R. 77 and 80.)

In January of 2002, Plaintiff attempted to return to work, part-time, as a proof operator at Signature Bank. (R. 68.) According to a letter written by the Chief Financial Officer of Signature Bank, Plaintiff acknowledged experiencing problems with her eyesight at this time, which created additional work for other employees. (R. 68.) On February 5, 2002, Plaintiff was terminated after only seven days of employment due to her inability to perform the requirements of her job. Id.

On February 1, 2002, Plaintiff was examined by Dr. Hammer's partner, Dr. W. Sanderson Grizzard, a board certified ophthalmologist. Dr. Grizzard assessed Plaintiff's visual acuity[23] at 20/200 for the right eye and 20/40 for the left eye. (R. 74.) Additionally, Dr. Grizzard reported that Plaintiff was getting worse and showed persistent macular edema. Dr. Grizzard opined that Plaintiff needed to be evaluated by a diabetic doctor in order to get better control of her diabetes and needed to be evaluated by a retina specialist to obtain additional treatment in her right eye. (R. 74.)

Dr. Jonathan Mines, a specialist in vitreoretinal diseases and surgery, examined Plaintiff on February 27, 2002. (R. 93-95.) Plaintiff's vision acuity was 20/70 in her right eye and 20/50 in the left. Dr. Mines found a combination of nuclear sclerosis and anterior cortical lenticular spoking, as well as trace senilus. (R. 94.) Moreover, both of

---

[23] Acuity means sharpness, clearness, distinctness. Id.

Plaintiff's eyes suffered from intraretinal hemorrhages and microaneurysms and both eyes had macular edema. (R. 94.)

Dr. Mines diagnosed Plaintiff with hyperopic astigmatism and presbyopia[24], lid and brow ptosis,[25] low grade cataract,[26] vitreous syneresis,[27] and diabetic retinopathy with diabetic macular edema of a clinically significant nature on the right side. (R. 95.) On the left side, Dr. Mines diagnosed Plaintiff with hyperopia with hyperopic astigmatism and presbyopia, lid and brow ptosis, incipient cataract, vitreous syneresis, and diabetic retinopathy with diabetic macular edema of a clinically significant nature. Id. Dr. Mines recommended additional laser surgery in both eyes. Id.

Plaintiff returned to Dr. Mines after undergoing additional laser surgery in March and April 2002. (R. 92.) Dr. Mines noted significant eyelid ptosis which was "a definite impediment to the patient's visual potential given the loss of visual field." Dr. Mines recommended that Plaintiff undergo blepharoplasty.[28] Id. On June 11, 2002, Dr. Mines diagnosed Plaintiff with stable diabetic retinopathy on both sides and recommended minimal pan retinal laser and focal laser treatment. (R. 88.) Dr. Mines noted that potential acuity meter ("PAM") testing showed improvement and vision testing was assessed at 20/40. Id.

---

[24] Presbyopia is the physiologic loss of accommodation in the eyes in advancing age, said to begin when the near point has receded beyond 22 cm.

[25] Ptosis is a sinking down or prolapse of an organ. Id.

[26] Cataract is a complete or partial opacity of the ocular lens. Id.

[27] A syneresis is 1) the contraction of gel, e.g., a blood clot, by which part of the dispersion medium is squeezed out; or 2) degeneration of the vitreous humor with loss of gel consistency to become partially or completely fluid. Id.

[28] Blepharoplasty is a plastic surgery upon the eyelid. Id.

After Plaintiff applied for Social Security, the state agency ordered an opthalmology evaluation on November 7, 2002, performed by Dr. Don B. Knapp. (R. 96-98.) Dr. Knapp diagnosed Plaintiff with proliferative diabetic retinopathy, ptosis, and cortical cataracts in both eyes. (R. 96.) Plaintiff's right-sided vision was 20/200 and correctable to 20/80 and her left-sided vision was 20/50 correctable to 20/40. Id. Dr. Knapp noted Plaintiff's near vision capacity on the right was J9 and correctable to J8. Id. Plaintiff's near vision capacity on the left was J9 and correctable to J4. Dr. Knapp recommended additional laser therapy on the right and surgical correction of Plaintiff's ptosis. Id. Additionally, Dr. Knapp noted abnormalities in Plaintiff's visual field bilaterally. Id.

As of December 2002, Dr. Thomas G. Ward, a board certified ophthalmologist, reported Plaintiff's vision acuity as 20/200 in her right eye and 20/40 in her left eye. (R. 118-125.) Plaintiff complained of blurred vision, bleeding in her right eye and difficulty focusing. (R. 118.) Dr. Ward recommended that Plaintiff undergo additional laser surgery on the right side.

Plaintiff's treating physician, Dr. Natalie Shnitser, M.D., reported that Plaintiff continued to undergo treatment for diabetes, hypertension and depression from October 2001 through September 2003. (R. 139-148). On March 26, 2002, Dr. Shnitser noted that Plaintiff was tearful and concerned with her vision, and Dr. Shnitser reported that Plaintiff's vision was deteriorating. (R. 144.) Dr. Shnitser also diagnosed Plaintiff with depression and prescribed Prozac. Id. On August 19, 2002, Plaintiff informed Dr. Shnitser of pain in her right foot and feeling weak. (R. 142.) Dr. Shnitser diagnosed Plaintiff with peripheral neuropathy and advised that Plaintiff obtain orthopedic shoes.

Id. By November 5, 2002, Plaintiff's symptoms included reduced sensation in her arms and increased stiffness. (R. 141.) Plaintiff continued to complain of blurred vision and Dr. Snitser adjusted Plaintiff's insulin dosage. Id.

Plaintiff, again, underwent eye surgery and as of July 2003, and thereafter, her right acuity was assessed at 20/400 and her left acuity was assessed at 20/40. (R. 115-16.)

There are two physical residual functional capacity ("RFC") assessments of record performed by non-examining state agency physicians. (R. 99-114.) Jim Takach, MD., performed an assessment and found that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; stand and walk for about 6 hours in an 8-hour workday and sit for about 6 hours in an 8-hour workday; and push and pull without limitation. (R. 100.) Takach further found that Plaintiff could occasionally climb ladders, ropes and scaffolds, balance, stoop and crouch. (R. 101.) Takach indicated that Plaintiff's field of vision was limited, 20/80 in the left side and 20/40 in the right side.

Thomas S. Edwards, M.D., a board certified ophthalmologist, also performed an assessment and found that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; stand and walk for about 6 hours in an 8-hour workday and sit for about 6 hours in an 8-hour workday; and push and pull without limitation. (R. 108.) Edwards further found that Plaintiff should never climb ropes and stairs but could frequently climb ladders, ropes and scaffolds, stoop and crouch. (R. 109.) Edwards reported that Plaintiff also had limited near acuity and limited far acuity, and agreed with Takach that Plaintiff had a limited field of vision. (R. 110.) Edwards noted that Plaintiff's vision was poor in the right eye and moderate in the left eye. Id. Additionally, Edwards found that Plaintiff's

symptoms were attributable to a medically determinable impairment, and that the severity of the symptoms was consistent with medical and nonmedical evidence, as well as with Plaintiff's complaints. (R. 112.) Edwards also noted that Plaintiff could do light work but should be careful due to her poor eyes. Id.

At the hearing, the ALJ clarified that Plaintiff sought disability benefits for a closed period from June 29, 2001 through November 22, 2002. (R. 151.) Plaintiff testified that she was an insulin-dependant diabetic and that her diabetes had caused her severe problems in her right eye. (R. 153-54.) When last working at Bank of America, Plaintiff noticed that something was not right with her eyes and had to use magnifiers to see the screen. (R. 157.) She went to the optometrist to obtain glasses but was advised that glasses would not help and she was instructed to see an ophthalmologist. Id.

From June 29, 2001 to November 22, 2002, Plaintiff testified that she could not see anything and that her eye vessels continually bled. (R. 154.) Plaintiff underwent several laser surgeries and testified that her vision remained blurry. (R. 154-55.) Her main problem, Plaintiff stated, was focusing because her eyes continually watered. (R. 156.) Id. During that time period, Plaintiff used a magnifying glass to read and even then could only read certain types of print. Additionally, Plaintiff was unable to drive because bright sunlight irritated her eyes. Id.

The ALJ determined that Plaintiff suffered from diabetes mellitus with retinopathy. (R. 13.) However, the ALJ concluded that Plaintiff did not have "severe" enough an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4. Id.

Specifically, the ALJ found that Plaintiff's reduced visual acuity was not of the severity described in Sections 2.02, 2.03. Or 2.04 of the Listings of Impairments. Id.

The ALJ then determined that Plaintiff retained the RFC for essentially a full range of light work. (R. 14.) Specifically, the ALJ found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk and sit for 6 hours in an 8-hour day; and push and pull without limitation. Because of Plaintiff's limited field of vision and near and far acuity, the ALJ concluded that Plaintiff should never climb ropes, ladders, or scaffolding and should not work at heights or around dangerous machinery. Id. The ALJ determined that Plaintiff could perform her "past relevant work as a "bank proof operator" based upon evidence from the State Agency physicians that Plaintiff's eyesight was sufficient to perform such a job. Id. Thus, the ALJ concluded that Plaintiff was not disabled during the time period at issue. (R. 15.)

## IV.  **DISCUSSION**

The two issues Plaintiff raises on appeal are: (1) whether the ALJ erred as a matter of law by classifying Plaintiff's past relevant work as a proof operator; and (2) whether the ALJ erred as a matter of law by concluding that Plaintiff could perform work as a proof operator while simultaneously finding that Plaintiff suffered from limited near acuity.

### A.  **The ALJ Erred By Evaluating Plaintiff's Past Relevant Work as a "Proof Operator"**

Plaintiff contends that her work as a proof operator is not "past relevant work" as defined by the regulations. Step Four of the sequential evaluation process requires the ALJ to review the claimant's residual functional capacity ("RFC") and physical and

11

mental demands of the claimant's past work.[29] "Relevant" past work is work that is (1) performed within the last 15 years, (2) lasts long enough for a claimant to learn to do it, and (3) constitutes substantial gainful activity.

The burden of proof regarding the claimant's inability to perform past relevant work initially lies with the claimant.[30] Here, the record illustrates that Plaintiff only performed the job of proof operator for seven days before she was terminated. (R. 68.) A letter from the CEO of Signature Bank discloses that Plaintiff worked as a part-time proof operator from January 28, 2002 through February 5, 2002. Id. Furthermore, Plaintiff's Work History Report also discloses that Plaintiff only worked as a proof operator for one week. (R. 40, 56-57, 68, 72.)

Plaintiff's work for one week as a part-time proof operator does not constitute "past relevant work" because: (1) Plaintiff was unable to earn sufficient income during just one week of part-time employment[31] and, (2) there is no evidence that Plaintiff performed the job of proof operator even long enough to become sufficiently skilled in the occupation. As such, the ALJ erred in utilizing Plaintiff's job as a proof operator as her past relevant work. Rather than referring to Plaintiff's job as a proof operator as past relevant work, the ALJ correctly should have characterized Plaintiff's past work as a

---

[29] 20 C.F.R. § 404.1520(e) (2005).

[30] See supra note 14.

[31] Plaintiff earned just $397.50 as a part-time proof operator from January 28, 2002 through February 5, 2002. Doc.10. Earning less than $700 per month generally establishes that the claimant did not engage in substantial gainful activity. 20 C.F.R § 404.1574(b)(2).

proof operator as an unsuccessful work attempt.[32] Indeed, the Field Office initially classified it as such, specifically as "UWA" in its Disability Report dated July 26, 2002. (R. 49-52.)

Defendant argues that the ALJ did not improperly evaluate Plaintiff's past relevant work as a proof operator. As support for Defendant's argument, Defendant points to the statement by the ALJ that Plaintiff's past relevant work was "proof operator, bank card operations."[33] According to Defendant, this reference would encompass Plaintiff's work as both "proof operator" and in "banking operations." Further, Defendant argues that because the ALJ later made note in his decision of Plaintiff's temporary work in 2002 - and stated that he was not considering it as past relevant work - the ALJ was not confused and got it right.

At the very least the ALJ's decision is confusing, and not a model of clarity with regard to the whether he evaluated Plaintiff's past relevant work as a proof operator or evaluated Plaintiff's past relevant work in banking operations. For this reason it is difficult for the Court to make a meaningful evaluation of the ALJ's decision. Certainly, to the extent that the ALJ utilized Plaintiff's job as a proof operator to evaluate her past relevant work the ALJ committed clear legal error. And because the ALJ did not find that Plaintiff could perform any of her other past jobs, the ALJ should have proceeded to step five of the sequential analysis rather than stopping at step four.

---

[32] 20 C.F.R. §§ 404.1574(a)(1), 416.974(a)(1) (2005); Social Security Rulings 84-25, 1984 WL 49799 (1984). The Social Security Administration generally considers work effects lasting three months or less because of the claimant's impairments as an unsuccessful work attempt. Such work is not considered evidence of an ability to engage in substantial gainful activity. Id.

[33] R. 12.

However, as discussed below even if the ALJ meant to refer to Plaintiff's job in banking operations as the relevant past work, the decision is still due to be reversed and remanded because the ALJ never addressed the near acuity, far acuity or field of vision requirements of the occupation of proof operator or the occupation of being involved in banking operations, as Plaintiff performed with Bank of America for a number of years.

**B.     The ALJ's Finding That Plaintiff Could Perform as a "Proof Operator" Conflicts With His Finding That Plaintiff Has Limited Near Acuity**

In addition to the ALJ's error in evaluating Plaintiff's past relevant work as a proof operator, the ALJ also erred in concluding that Plaintiff could perform her past relevant work because the occupation of proof operator requires constant near acuity, at least 2/3 of the time in an eight hour day according to the Dictionary of Occupational Titles. While the ALJ correctly found that Plaintiff suffered from near acuity limitations, the ALJ never analyzed the near acuity, far acuity or field of vision job requirements of a proof operator and never addressed how the Plaintiff could perform the job despite the near acuity problems.

The ALJ found that Plaintiff's testimony about not being able to see anything was embellished. (R. 14) As support for this conclusion the ALJ noted that Plaintiff's macular edema improved in early 2002 and that Plaintiff's left eye had a 20/40 visual acuity. The ALJ then relied solely upon the conclusions of the State Agency physicians in determining that Plaintiff could perform her past relevant work as a proof operator despite her limited visual acuity. The ALJ's finding that the Plaintiff could perform her past relevant work means that the ALJ assumed Plaintiff was able to perform the job of

proof operator with only semi-clear vision in one eye only and almost no vision in the other.

Further, contrary to the assumption made by the ALJ, the state agency physicians did not state that Plaintiff could perform her past work as a proof operator. For example, Dr. Takach's assessment only found that Plaintiff had a limited loss of her visual field but no limitations in far or near acuity. (R. 100-102.) Dr. Takach - who is not an ophthalmologist - did not determine that with a limited loss of a visual field, Plaintiff could still meet the requirements of a proof operator. (R. 99-106.)

And contrary to the ALJ's reasoning, Dr. Edwards, a board certified ophthalmologist unlike Dr. Takach, wrote that Plaintiff could do light work as long as it was "carefully selected due to poor eyes." (R. 112.) Dr. Edwards opined that Plaintiff's poor vision in her right eye and moderate vision in her left eye resulted in limited near and far acuity. (R. 110.) Dr. Edwards found that Plaintiff had a missing superior visual field. Id. Furthermore, unlike the ALJ, Dr. Edwards concluded that Plaintiff's symptoms were consistent with statements made by the Plaintiff regarding her inability to see. (R.112.)

Several other doctors, including the Commissioner's own examining board certified ophthalmologist, listed Plaintiff's near acuity as poor and on November 11, 2002, recommended yet another surgery for Plaintiff's right eye. (R. 96.) Plaintiff's treating physician, Dr. Shnitser reported Plaintiff's vision as deteriorating in March of 2002. Additionally, the record generally illustrates Plaintiff's constant treatment for visual impairments, most notably that Plaintiff underwent several laser treatments upon the recommendation of almost every physician.

Moreover, the letter written by the CEO of Signature Bank discloses that Plaintiff was unable to meet the requirements of her job due to her eyesight problems.[34] (R. 68.) As such, the ALJ should have considered near acuity as an integral part of the job of a proof operator as evidenced by the letter.

In sum, the ALJ misinterpreted the state physicians' findings and completely ignored the opinions of Plaintiff's treating physician. The ALJ failed to provide a concrete basis for rejecting Plaintiff's own testimony regarding her severe vision problems and difficulty at work. Additionally, the ALJ dismissed, without any explanation, evidence from the agency's own employees, as well as from the CEO of Plaintiff's previous employer, that Plaintiff was unable to perform the job of proof operator. Moreover, and most notably, the ALJ failed to even discuss or mention how near acuity, far acuity, and the field of vision impacts the ability to perform the basic job demands of a proof operator.

Alternatively, even if the ALJ had meant to evaluate Plaintiff's past relevant work in banking operations - and not as a proof operator - the ALJ still erred by failing to evaluate how Plaintiff could perform the basic job requirements of the job in bank operations with the documented field of vision and near and far acuity problems suffered by Plaintiff.

## V.  CONCLUSION

In view of the foregoing, the decision of the Commissioner is **REVERSED AND REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner for the

---

[34] According to the Dictionary of Occupational Titles, the description of proof operator requires such a person to read small numbers on checks, compare machine totals, correct errors, prepare checks and enter data. Dictionary of Occupational Titles, available at www.occupationalinfo.org. all of which would require near acuity on a daily basis.

Administrative Law Judge to: (1) properly discuss and evaluate Plaintiff's past relevant work in bank operations at Step Four of the sequential analysis; (2) properly determine, analyze and discuss the basic work demands of Plaintiff's past relevant work particularly with regard to the requirements of far and near acuity and evaluate the record more thoroughly in determining whether Plaintiff met those basic work demands in light of her field of vision problems; and (3) conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter final judgment accordingly and close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on September 20, 2006.

GARY R. JONES
United States Magistrate Judge

Copies to:
    Counsel of Record